ILLINOIS STATE BOARD OF EDUCATION
IMPARTIAL DUE PROCESS HEARING

| | |
|---|---|
| KYLER H█████,<br>        Student,<br>    and<br><br><br>CHICAGO PUBLIC SCHOOL DISTRICT 299,<br>        District. | Case No.: 2007-0339<br><br>DECISION AND ORDER |

## Decision and Order

### Jurisdiction

This matter is before the undersigned-hearing officer for a due process hearing pursuant to the Individuals with Disabilities Education Improvement Act ("IDEA 2004"). 20 U.S.C. 1400 et seq. (2004). This hearing officer has jurisdiction pursuant to 20 U.S.C. 1415 et seq. (2004), 105 ILCS 5/14-8.02a et seq., and 23 Il. Adm. Code 226.600 et seq.

The parent through her attorney, filed a due process complaint on June 20, 2007. The District received the complaint on June 20, 2007 and forwarded it to the Illinois State Board of Education ("ISBE") where it was received on June 27, 2007. The undersigned was appointed as hearing officer by ISBE on June 29, 2007, via letter, which the hearing officer received on July 3, 2007. This hearing officer subsequently sent out a Preliminary Scheduling Order on July 3, 2007.

A special evaluation session was conducted on July 30, 2007 finding the student eligible for special education and related services under the category of a learning disability. An IEP was completed on July 30 and August 2, 2007. The parent filed a dissent to the IEP./An amended due process complaint was filed on August 6, 2007 subsequent to numerous status teleconferences were held between the appointment of the hearing officer in June and convening of the hearing in October.

The parties jointly requested an extension to the forty-five day time line for a hearing, which was granted on August 7, 2007. The prehearing conference was held via teleconference on September 13, 2007. The due process hearing in this matter was held on October 24, 24, and 26, 2007, at Warren School, 9239 S. Jeffrey Avenue, Chicago, IL. The student was represented by Michael O'Connor of Mauk & O'Connor. The district was represented by Tracy Hamm of Chicago Public Schools Due Process.

### Issues Presented and Remedies Sought:

1. Whether CPS provided a free appropriate public education during the period from July,

    2002 through the present time based on:

a.  Failure to provide parent notice of her procedural rights from July, 2002 through July, 2006;

b.  Failure to conduct adequate assessments of all areas of potential disabilities; with the result that student's educational program did not address, or addressed inadequately, her learning impediments and emotional/behavioral difficulties;

c.  Termination of eligibility for special education in May, 2005 despite substantial evidence that emotional/behavioral, attention deficit and other impairments required special education services;

d.  Failure to conduct a full individual evaluation and make an eligibility determination on a timely basis despite repeated requests by parent and private providers during the 2005-2006 and 2006-2007 school year;

e.  Failure to convene an IEP meeting to review an IEE from a private psychologist that was completed in March, 2007;

f.  Failure to provide essential related services in areas of assistive technology, speech/language, psychological and social work services;

g.  Failure to develop an effective functional behavioral analysis and behavior intervention plan for the student;

h.  Failure to identify and utilize effective teaching methodologies at a sufficiently intensive level that would enable the student to make progress commensurate with her cognitive skills;

2.  Failure to offer a complete curricula in areas of reading, language arts, math, social studies and science, with the result that the student did not make academic progress;

3.  Whether the evaluations completed on 7/30/07 upon which the current IEP was based are incomplete and inadequate in that;

a.  The parent expressly requested a nonverbal assessment of cognitive skills, such as the CTONI or Leiter, and the school psychologist agreed that such testing was appropriate. Because the recommended tests were not available, the school psychologist failed to complete an adequate assessment of nonverbal cognitive skills by administering nonverbal subtests of other tests, such as the WASI nonverbal subtest. The testing did not adequately determine the causes of her learning disabilities, in that for example, the KTEA-II was administered to assess academic achievement, but five reading related subtests were not administered, nor were naming facility subtests administered.

b.  The speech pathologist conducted an assessment using a single screening tool, the Word-R test, which is a screening tool for expressive and receptive language difficulties. The student's communication difficulties should have included Clinical Evaluation of Language Fundamentals 3rd edition (CELF-3), Language Processing Test Revised (LPT) or the Test of Language Development, Primary, 3rd edition (TOLD-P-3).

c.  The occupational therapist did not complete an adequate assessment of sensory concerns; visual motor skills were screened but results not used to make more in depth assessment of strengths and deficits in visual processing and visual motor skills; organization skills were not assessed even though student has an ADHD diagnosis and a GETS form was used to arbitrarily assign severity and minutes of services.

d.  Assistive technology service needs have not been assessed to date.

4.    Statements of present levels of performance listed on the goal sheets do not accurately and objectively state student's skill and functional levels; further, goal statements are vague and not measurable nor are the goals as defined commensurate with the student's potential for development.

5.    The IEP fails to identify what methodology would be used to remediate student's reading and math skills;

6.    The IEP provides for an inadequate level of related services in that:

a.  Speech/language services are authorized at 30 mpw but should be at least 60 mpw for a child with significantly depressed expressive and receptive language skills;

b.  Social work services are authorized at 90 minutes per month, 21 minutes per week, but should be at least 60-90 minutes per week; further, the IEP doesn't provide for both group and individual therapy sessions;

c.  Occupational therapy services are authorized for only 15 minutes per month consultative and no direct OT services; the student should receive direct OT services in a manner to be determined by an adequate OT assessment;

7.    The IEP fails to authorize extended school year services, despite findings by both the school psychologist and the speech pathologist that student has made no progress or regressed during the past two school years;

8.    The IEP did not address compensatory education services, despite findings by both the school psychologist and the speech pathologist that student has made no progress or regressed during the past two school years;

9.    Placement authorized by the IEP in a self contained classroom is inadequate because:

a.  The student will be exposed to children with a primary diagnosis of emotional behavior disorder, traumatic brain injury or other serious impairments other than learning disability;

b.  The student will be exposed to children up to two-three years above or below her age and skill level;

c.  Classroom size will not allow student to receive individualized instruction with the degree of intensity that she requires to make reasonable academic progress.

The remedies being sought by the parents are:

1.  Private therapeutic day school placement at public expense;

A-4

2.  Independent educational evaluations at public expense in areas of identified need, including psychological assessments of cognitive and academic skills, occupational therapy assessments and speech language assessment.

3.  CPS provide related services in sufficient intensity to allow student access to educational opportunity, including:

    a.     Social work services and/or psychological counseling 60 mpw or more;

    b.     Support for assistive technology software and equipment for at least 30 mpw.

    c.     Direct speech language services at least 60 mpw.

4.     Direct CPS to provide compensatory education services for loss of FAPE during the past two years, including:

    a.  Additional social work and/or psychological counseling services of 30 mpw for two years;

    b.  Tutoring by a certified special education teacher at a site selected by the parents for two hours per week for two years;

    c.  Such additional services as may be recommended by any ordered IEEs.

5.     Direct CPS to convene an IEP meeting that will consider the results of evaluations and implement the foregoing relief, and

6.     Other relief to be determined.

The remedies being sought by the district are:

    1.  Implementation of the August 1, 2007 IEP as proposed by the district.

    2.  Denial of all relief being sought by the parents.

## Burden of Proof

The parent has the burden of proof as she filed the due process complaint. *Schaffer v.Weast*, 126 S.Ct. 528 (2005).  Under Illinois law, the school district must provide evidence that the special education needs of the child have been appropriately identified and that the special education program and related services proposed to meet the needs of the child are adequate, appropriate and available. 105 ILCS §14-8.02a(g).

**Findings of Fact:**

**Background**

1. Student is an eight year old girl in third grade at Warren School. She was born with the umbilical cord wrapped around her neck. Mother observed left sided weaknesses and early developmental delays early on, beginning when she could not raise her head at two months of age. Student was found eligible for and received early childhood services till age 3 on the basis of developmental delay (PD 113).

2. Her mother signed the Consent for Initial Special Education Placement (PD 176) on 7/3/02. The mother was also receiving counseling to help her cope with student's needs in 2001 (PD 219).

3. Student was placed in the ECSE preschool blended program at Caldwell School 9/3/02 (PD 247), where she remained through the 2004-05 school year. She had a psychological evaluation on May 9, 2005 (PD 250) where she scored 83.5/113 on the Brigance Kindergarten/first grade readiness screen, a below average score. The WISC-IV was administered, with a full scale IQ of 87. Her overall cognitive ability was noted to be in the low average range with performances in verbal comprehension and processing speed indexes in average range. Perceptual reasoning index in low average range and working memory in borderline range. The evaluator concluded "At this time, student is not exhibiting any deficits that meet eligibility for a disability."

4. On (Dist. 26), a Section 504 plan from 5/27/05, the box checked on the form indicates 'parent sent conference notification and copy of parents' rights at least ten days before the meeting,' however no copy of the notification itself was submitted by either party and mother testified she never received any procedural safeguards.

5. Student has a history of asthma and chronic ear infections including tubes placed in her ears (which were removed in 2003) (PD 175). As a result of her health issues, she has experienced extensive absences from school (PD 108). She is now being treated with Singulair and an albuterol rescue inhaler for her asthma which she is authorized to use at school as needed.

6. At the transition period between early childhood and regular education, her eligibility for special education ended and a 504 plan was created which primarily addressed her health issues, in particular asthma and the need for medications during school hours. (PD 99). It was recommended that she enter kindergarten because "she needs the kindergarten curriculum following the preschool program." (PD 110; Dist. 30). In spite of this recommendation, student was placed in first grade. She received F's in reading, writing and spelling.

7. (PD 525) is a letter from Sara Ebert, student's classroom teacher at the time. She writes: "I have observed that she is not working at an academic level consistent with that of a first grade student. Student is missing many of the basic skills, including letter/sound recognition and basic math computation skills that are necessary to succeed at the first grade level. I feel it would be in student's best interest to have her academic skills evaluated to find the best fit to encourage the growth of her academic skills."

8. (PD 526) contains anecdotal school records from 9/6/05 to 3/24/06, which find that "student has made few gains during first grade and is lacking many of the basic skills she would have gained had she attended kindergarten, finding her inadequately prepared for the curriculum presented in first grade;" and "It has come to my attention that student has spent three years in a pre school or pre kindergarten program and that she has never been to kindergarten before entering first grade. To some degree this would account for the lack of basic letter recognition, phonics, writing skills and basic

mathematic computation skills. Further, it was noted that student's literacy skills were tested twice using DIBELS, and both times student was classified in the intensive support category and showed little gain.

9. Progress reports from 10/12/05 (PD 518), 12/12/05 (PD 517), and 5/22/06 (PD 516), note that student was failing reading, writing, math, science, and social studies for most of that time. For one reporting period she was doing average in science, and throughout she was either performing average or good in library, PE and music.

10. Student has had behavioral difficulties from a very young age which have worsened over time, including violent and aggressive behaviors such as hitting, sticking her teacher with a pin, swearing, and not following directions. Due to her increasingly violent and aggressive behaviors at school, her mother sought treatment for her in 2006. The treating professionals recommended inpatient hospitalization at Hartgrove Hospital, where student spent five weeks beginning in April, 2006. The goals for treatment were to decrease her aggressive violent behavior, develop appropriate anger management skills and evaluate for medication. On admission, student was verbally profane and disruptive. This behavior continued throughout the hospitalization. She was discharged with a diagnosis of oppositional defiant disorder and ADHD and prescribed Concerta and Risperdal, and was given a guarded prognosis because she made no improvement in her behavioral issues during the entire time she was hospitalized. (PD 355; Dist. 31).

11. In May, 2006, the therapist student was seeing recommended that the mother request a case study and evaluation from the school to diagnose a possible learning disorder and developmental delay for the student (PD 331).

12. In (PD 569), student's Elementary School Progress Record, her absences are detailed. In 2003, she missed 40 days. In 2004 she missed 22. In 2005, she missed 21 days. In 2006 she missed 29 days, and in 2007 she missed 23. Her grades for those years are also detailed. In first grade she had an F in reading, C in listening, B in speaking, F in written comprehension, F in math, science, and social studies and a B in music, PE and library. In second grade she had an F in reading, C in listening, B in speaking, F in written comprehension, F in spelling, C in handwriting, D in math, F in science, D in social studies, B in music, C in PE and B in library science.

13. In April, 2007, student's mother wrote a letter referring her daughter for an evaluation for special education. (PD 102; Dist. 37). District declined to evaluate student, (PD 540; Dist. 51), noting "Our psychologist accepted the outside psychological report from Dr. Martin Blackman dated 2/13/07. As a result our psychologist has determined that student does not meet the criteria of a student with a learning disability. She is currently achieving at expectancy given the amount of academic instruction that she has received thus far. Evidence clearly demonstrates that when provided with appropriate supports, student shows continued academic growth. It is the recommendation of the psychologist (CPS) that student continue to receive interventions and supports necessary for continued academic development."

14. (PD 364-375). Student was receiving individual therapy weekly and family therapy once a month. The psychiatrist and psychologist treating her expressed concerns about her school behaviors and performance, and (PD 378) recommended that student should be evaluated for special education services to help determine which services, teachers and classrooms are most beneficial.

15. In May, 2007, student's mother again referred her daughter for an evaluation, (PD 103), basing her referral on the fact that a psychiatrist had diagnosed student with ADHD, learning disability and oppositional defiant disorder. Again, the district refused to evaluate, (PD 541) stating in their letter, "our psychologist has determined that student does not meet the criteria of a student with a learning disability." They also note that, "Teacher believes student should be retained and not placed in special education." In a

note written at the bottom of the letter, it reads "She should have been placed into first grade last year according to her teacher; however our region office refused the change request."

16. The parent requested due process, and an evaluation was done in the summer of 2007. A learning disability was diagnosed, and an IEP was drafted. The parents objected to the IEP and amended their due process request to incorporate those objections. (See Due Process Complaint and Amended Due Process Complaint Dist. 11). After the due process complaint was filed, (Dist.12), the district proposed that compensatory services of two hours of special education services per week for the school year be provided in addition to the services recommended on the IEP of August 2, 2007.

## The IEP of 7/30/07 and 8/2/07

17. Parent signed consent for evaluation on 7/30/07. (Dist 53), indicating she had received an Explanation of Procedural Safeguards. Student was deemed eligible for social work services (Dist. 58, 59) based on her behaviors interfering with her academic progress as well as a significant inability to build and/or sustain satisfactory interpersonal/social relationships with peers or authority figures. She was determined by CPS to have a moderate receptive expressive language deficit (Dist. 60), as well as a communication disorder in language documented in reading and language arts with difficulty initiating, maintaining and terminating verbal interactions as well as difficulty understanding and following directions. (Dist. 61). An OT consult was recommended as well as an assistive technology evaluation. In the Eligibility Determination (Dist. 78), it was noted that there were several areas which showed a discrepancy between student's achievement commensurate with his/her age and ability; and finally, parent signed a certification of receipt of procedural safeguards on 8/2/07.

18. On the IEP (Dist. 84), several Modifications and Accommodations are delineated, including:

　　a. OT to consult with classroom staff 15 minutes per month to address printing modifications.
　　b. student should write on modified paper to assist with spacing between words.
　　c. SLP to consult with classroom staff to establish consistency between semantic vocabulary utilized in classroom and therapy setting.
　　d. For all academic areas: provide a predictable structured daily routine; provide preferential seating; give student lead time before she is expected to respond to oral questions in the classroom; allow for paired/shared reading activities; student could have previously practiced sentences for participation; preview vocabulary before reading assignments are given; provide frequent motor breaks as needed; give correct instruction and assistance when student is writing; encourage the use of diagrams, illustrations and other graphic organizers; provide a token economy, allow student choice in reinforcers; establish a "first …then…" routine; give praise and encouragement for positive behaviors and work completion skills; use of math manipulatives, for math have student complete 2-3 p problems and check them over for her before she is asked to complete an assignment independently

19. On the Summary and Conclusions page of the IEP drafted 7/30 and 8/2/07, it is noted that student's reading skills are in the extremely low range, that her reading decoding is no better developed than her comprehension. These scores show no progress over the past two years. Her math and spelling are at a first grade level. She has "low average cognitive development." (PD 249).

A-8

20. Several goals were drafted in the IEP for student as follows:
21. **Language Arts: Written Expression. Present level of performance**: Student can share her feelings, opinions and ideas orally. She has much difficulty in composing simple sentences to express herself in writing. 100 mpw to be provided in separate class. **Measurable Annual Goal**: Student will communicate ideas in writing for a variety of purposes—to inform, explain, describe, narrate, create or persuade, with minimal assistance and 85% accuracy and demonstrated by 5-6 sentences. **Quarterly benchmarks:** 1) with moderate assistance will write simple sentences to label, explain or describe (80% accuracy); 2) with moderate assistance will write 2-3 sentence paragraphs with a topic sentence to narrate, describe, explain, persuade. (80%); 3) with moderate assistance will write 3-4 sentence paragraphs having topic sentences and supporting details to inform, describe, create, persuade. (80%). Suggested evaluation methods include rubrics and writing conferences weekly.  (PD 25)
22. **Language Arts: Spelling.  Present level of performance**: student can share her ideas verbally. Spelling is a skill she finds challenging due to her poor decoding skills. She often just writes the first letter of a word. **Measurable annual goal**: Student will use correct spelling, grammar, and punctuation when writing sentences at 85% accuracy rates on class assessments and a 6 mo. gain as seen on a standardized assessment. **Quarterly benchmarks:** 1) will use end punctuation marks correctly; will correctly spell words ending in consonants with suffixes (80%); 2) will use capital letters when writing proper nouns, titles, and initials, and will use correct spelling for homonyms (80%); 3) will use correct subject/verb agreement in sentences; will correctly (sic) spelling of words with r-controlled vowels (ar, ir, or) (80%). (PD 032). Instruction for 75 mpw in separate class with oral and written tests weekly.
23. **Language Arts: Decoding Skills. Present level of performance**: Student can decode some predictable short/long vowel words. She has a limited sight word vocabulary including words such as on, be, was, that, again. **Measurable annual goal:**  Student will apply word analysis skills to identify and understand unfamiliar words independently with 80% accuracy on classroom assessments and demonstration of 6 months gain on a standardized assessment. Quarterly benchmarks: 1) will read words that have predictable patterns, CVC and CVCE; 2) will read words having initial blends and continue to recognize predictable word patterns in every day reading materials; 3) will recognize and use familiar word patterns to identify new words. Instruction for 100 mpw in separate class with rubrics and assignments as evaluation tools. (PD 33).
24. **Language Arts: comprehension. Present level of performance**: Student can express her interests and share ideas. Her comprehension is limited to gleaning information from pictures due to her deficits in reading decoding skills. **Measurable annual goal**: Student will comprehend a broad range of reading materials with  moderate prompts at 80% accuracy levels as assessed by classroom assessments and a 6 mo. gain on standardized assessments. Quarterly benchmarks: 1) with moderate assistance will read directions to perform a task and apply the directions to specific situations (80%); 2) with moderate assistance will use information to form, explain support questions and predictions while reading text (75%); 3) with moderate assistance will say, recognize and use key words used in text. (75%). This goal will be addressed 100 mpw in a separate class, and will be tested biweekly. (PD 041).
25. **Language Arts: Social Science/Science. Present level of performance:** Student is able to follow a set format or routine when working on a book report or science project. She has difficulty in responding to oral questions about her completed work. **Measurable annual goal:** Using visual cues, student will demonstrate an increase in the ability to locate, organize and use information from various sources to answer questions

and communicate her ideas with 85% accuracy. **Quarterly Benchmarks: 1)** with moderate assistance, will identify and record the main idea, linking details and summary of a report or project (80%); 2) with moderate assistance will practice/role play various oral presentation simulations to demonstrate confidence (80%); 3) with minimal assistance will record/identify the important points, practice oral presentations and participate in self critiques. (80%). She will receive 100 mpw in a separate class on this goal and will be evaluated through student/teacher conferences and practice sessions.

26. **Mathematics: computation skills. Present level of performance:** Student does not display math facts memorization skills. KTEA II math computation GE K.7. **Measurable annual goal**: Student will use numbers to show order independently with 90% accuracy of classroom based assessment and demonstrate at least 6 months gain on a standardized assessment. **Quarterly benchmarks: 1)** will read/write numbers to show order or to sequence events; (80%); 2) will use signs to compare/contrast the values or size of whole numbers; (80%); 3) will put whole, fractional, decimal numbers in order on a number line. (85%). She will receive 100 mpw instruction on this goal and for evaluation "see suggested assessment" is noted. (PD 43).

27. **Mathematics: problem solving skills. Present level of performance:** Student is challenged to problem solve when she is confronted with more than one operation. KTEA II Math Application and concepts. GE 1.1. **Measurable annual goal: 1)** with moderate assistance, student will problem solve using number facts and operations with 85% accuracy on ISBE based assessment and demonstrate at least 6 months gain on standardized assessment. **Quarterly Benchmarks**: 1) with moderate assistance will identify pictorial representations of fractions; (80%) 2) with moderate assistance will solve traditional 1-2 step problems; (80%) 3) with moderate assistance will solve traditional 1-2 step problems which may include nonessential information. (80%). She will receive 100 mpw in a separate class and be evaluated with "suggested assessment." (PD 48).

28. **Social Sciences:  Present level of performance:** Student can participate in group or class discussions. She experiences difficulty with reading materials in the content areas. **Measurable annual goal;**  Student will demonstrate an understanding of the development of the United State political ideas and traditions through charts, illustrations, reports, dramatizations and timelines with 80% accuracy. **Quarterly Benchmarks**: 1) will describe/give examples of diversity in the US 80% accuracy; 2) with 80% accuracy, will describe how regional folk heroes and other important figures have contributed to the cultural history of  US; 3) will interpret quotations from famous Americans throughout history. (80%). She will work on this goal 200 mpw and be tested by unit. (PD 049).

29. **Social/emotional: Present level of performance:** Student has shared that she has friends at school but that she feels sad when there are arguments or when she or others act out. **Measurable annual goal:** Student will use appropriate social skills at school as observed in 9/10 opportunities. **Quarterly Benchmarks**: 1) will describe social situations that cause social problems and what happens before/after (8/10); 2) will accurately monitor own behaviors and their consequences and review skills that can solve problems (8/10); 3) will use social skills in controlled simulations and in naturally occurring situations (8/10). She will work on this goal 40 mpw and will have her progress and frequency charted weekly.

30. **Social/emotional: Present level of performance**: Student would like to share positive friendships; she frequently is angry with her classmates when teased or frustrated. **Measurable Annual Goal:** With minimal cues, student will express her anger in nonaggressive ways as observed in 10/10 opportunities. **Quarterly benchmarks: 1)** will identify personal triggers than cause her to be angry/frustrated (9/10); 2) will explain

verbally and role play/demonstrate use of anger reducers (self talk, visualization, counting, etc.) (9/10); 3) will use one or more of the learned strategies in naturally occurring situations (9/10). She will work on this goal 40 mpw and have progress charted weekly. (PD 57).

31. **Social/emotional: Present level of performance;** Student wants to befriend others and get along with her classmates. She experiences anger and frustration when teased by others. **Measurable Annual Goal:** Student will use effective problem solving to resolve conflicts with peers or adults as observed in 8/10 opportunities. **Quarterly Benchmarks:** 1) will demonstrate calming herself, waiting ten seconds before speaking or acting (8/10); 2) will ask for adult assistance with problem solving instead of responding inappropriately (8/10); 3) will reflect upon a conflict and its resolution with an adult by talking, illustrating or writing. (8/10). She will spend 40 mpw on this goal and have her progress charted weekly. (PD 58).

32. **Social/emotional: Present level of performance:** Student needs to demonstrate decision making skills and responsible behaviors in personal, school and community context. **Measurable Annual Goal:** Student will apply decision-making skills to deal responsibly with daily academic and social situations. **Quarterly Benchmarks:** 1) Student will engage in activities that helps (sic) to recognize that one has choices in how to respond to situations and be able to identify five different choices; 2) Student will engage in activities that teach one use of "I" statements in expressing feelings; be able to apply this skill 5 out of 7 times; 3) Student will engage in activities that teach/implement stop, think and act (Plan) strategies in solving problems and demonstrate 5 out of 7 instances her ability to apply strategies. Student will work on this goal 30 minutes per month and will have her progress observed at least quarterly. (PD 59)

33. **Social/emotional: Present level of performance;** It was stated that student responds aggressively to peers provocative actions. She needs to demonstrate decision-making skills and responsible behaviors in personal, school and community context. **Measurable Annual Goal:** Student will consider ethical, safety and societal factors in decision-making. **Quarterly Benchmarks:** 1) Student will engage in activities that help her to identify and follow bus, classroom and school safety rules and be able to verbalize three rules from each category with 100% accuracy; 2) Student will engage in activities that helps (sic) to understand how hitting, yelling at someone is hurtful and unfair and be able to verbalize 3 reasons why hitting and yelling are unfair; 3) Student will engage in activities that help her describe situations in which she feels unsafe and need (sic) help and be able to describe at least 3 situations. She will work on this goal 30 minutes per month and will have her progress charted at least quarterly. (PD 60).

34. **Social/emotional: Present level of performance;** Student has problems with academic frustration and responding aggressively to peers provocative behaviors in class, on the school bus and in all settings of the school. She needs to develop self awareness and self management skills to achieve school and life success. **Measurable Annual Goal:** Student will identify and manage her emotions and behaviors. **Quarterly Benchmarks:** 1) Student will engage in activities that identify emotions; will be able to identify at least 6 emotions out of 10 with 100% accuracy; 2) Student will engage in activities that expose her to emotions felt by characters in stories; be able to identify at least 6 emotions with 100% accuracy; 3) Student will engage in activities that will assist her in identifying ways to calm herself using emotion words that she's learned with 85% accuracy. Student will work on this goal 30 minutes per month and have her progress charted at least quarterly. (PD 61).

35. **Receptive/Expressive Language; Present level of performance:** Student's comprehension and expressive deficits interfere with her academic participation and

class work. She was able to recall 6/15 functional multiple definition concepts.
**Measurable Annual Goal:** Student will improve vocabulary skills for word associations, synonyms and expressive reasoning (40 concepts related to curriculum). **Quarterly Benchmarks: 1)** Student will improve vocabulary skills for word associations (20 concepts) with 80% accuracy; 2) Student will improve vocabulary skills for a [unreadable] set of 40 synonyms with 80% accuracy; 3) Student will improve expressive reasoning through inferential reasoning exercise (40 concepts) with 80% accuracy. Student will work on this goal 30 mpw with progress charted once a week. (PD 62).

36. The total amount of special education and related services on this IEP is 1043 minutes with the student removed from regular education from 61 to 100% of the time. She will be able to participate with nondisabled peers in science, art, music, library, technology, PE, and lunch. (PD 063)

37. This placement was justified as being the least restrictive environment (LRE) for student because of her significant deficits in reading and math, and that she would benefit from intensive remediation. (PD 64) Additional inclusion was to be explored as student's math and reading scores improve and as her social/emotional development progresses. (PD 064). Modifications to classroom assessments were proposed, including: 1) testing in small group setting; 2) allow frequent breaks; 3) read non reading test sections aloud; 4) provide extended time for reading and math with up to 50% additional time.  The IEP also provided that the student would participate in local and standard state assessments in reading, writing and math with modifications and accommodations.

### Functional Behavioral Analysis and Behavior Intervention Plan

38. A Functional Behavioral Analysis and Behavior Intervention Plan was developed as part of the IEP. (PD 068). The targeted inappropriate behaviors include: physical aggression in class, on the playground, in line, and in hallway weekly;  verbal outbursts in class, hall, lunchroom weekly; and nonconformance with school rules daily in the classroom, hallways and lunchroom. (PD 68); the behaviors were occurring when others call her names, she feels inadequate and frustrated with her academic deficits. It was noted that transitions were problematic for her.

39. The nonrestrictive interventions planned included: preferential seating, token economy, structured group activity, teacher/student conferences, and opportunity to assume leadership roles. Restrictive interventions included time away from the instructional setting and minimal restraint if she was harming herself or others.

### Mother's Testimony

40. Student's mother testified that there are three children in the family, ages 15, 13 and student, the youngest, age 8. Student's mother is married, not to the student's biological father. She characterized student as a happy child who likes to play, dance, draw, do art, and go places. She testified that she noticed early on that student had developmental delays along with health issues such as chronic ear infections, asthma, and tubes in her ears (which have been removed).

41. She went into CPS for early childhood services, and struggled academically and behaviorally. When she transitioned out of early childhood, she was found ineligible for special education and placed in a regular education classroom. Despite recommendations from the team, she was skipped over kindergarten and placed in first grade because of her age, six at the time.

42. She testified that she has not gotten copies of procedural rights; though it is clear from the record that she has been in attendance at every meeting and a vital fixture in her daughter's education.

43. The mother was in contact with the classroom teacher several times a week due to student's continued behavioral and academic problems. Her teacher at the time, Ms. E, told the mother that it was not surprising she was behind because she had no kindergarten foundation. At a meeting at the end of the year, Ms. E said student should be retained again in the first grade, because she didn't make any progress due to her lack of a kindergarten foundation. During that same year, student and mother began to receive services from Metropolitan Family Services.

44. Mother discussed the need to evaluate her daughter for potential disabilities with the case manager at the time, MH. Ms. Greenwood, her therapist at Metropolitan Family Services, also wrote a letter regarding the need to evaluate the student. No evaluation took place, and instead the student was placed in a regular second grade classroom.

45. She doesn't think the proposed placement is appropriate, and instead would like a therapeutic day placement at Acacia Academy or a similar school. She and student visited Acacia, which she liked, and believes her daughter would do well there.

### The IEP Team, School Personnel and Private Evaluators

#### Counselor/Case Manager

46. DL, the counselor/case manager was one of the summer assessment team who evaluated student and developed the IEP. She has spent 14 years at CPS, and has a Bachelor's degree in English/language arts/ literature and a master's degree in special education. Her certifications include counseling, Type 3, Type 10, Type 73 and Type 9 for grades 6-12. DL believes student is friendly, active and enjoys her family. She says student's challenges include difficulty with unstructured time, and getting along with her peers. Academically, she has difficulty with reading and math, where she is not at grade level.

47. DL wrote many of the goals for student at the summer assessment. In discussing methodologies for the various goals, she indicated that they use a Whole Language approach for spelling to increase decoding, and provide for repetition and phonemic awareness. DL says she observed Wilson Reading System at Lane Tech and they are implementing it at Warren. She also mentioned that they use the CLOZE procedure, repetition of words and word families which is helpful in word identification. For the written expression goal (PD 25) the methods/strategies discussed were to use pictures, label, journals, pictures, and diagrams. Methods teachers can use (PD 34-35) to teach word analysis, context and decoding were discussed.

48. The team discussed placement options: 1) regular education with consult; 2) general education class, receiving services in class with pull out 20 to 60%; and 3) small class with opportunity to be with typically developing peers. According to DL, they chose option three, a small class with the opportunity to be with typically developing peers for science, art, music, PE and library.

49. DB, the school psychologist, has been at Warren since 1974. He has Type 73 and Type 75 certificates. He administered the KTEA II but he didn't use all the subtests, testifying that he didn't use the reading expression subtest because "the rubric for scoring is very involved." Though the CTONI was suggested, in place of it he gave other examinations.

50. DB testified that student's learning disability did not suddenly appear, but it has been there over the course of her schooling, and not recognized. He also doesn't understand why the last psychologist recommended she was ready for first grade, given her then

A-13

score on the Brigance First Grade Screen of 83.5/113, where 83 is a below average score. He testified that she is at least a year delayed in decoding and phonics due to missing kindergarten, and that her scores reflected low average ability, at 1 to 1 ½ standard deviations below the mean of 100. He did, however, agree with the placement recommendation because she has a speech/language disorder that needs to be addressed, and did not believe her to be emotionally disturbed. The scores on the test that DB administered are as follows:

51. Test scores on KTEA II Form A

| | | Standard Score | Grade Level |
|---|---|---|---|
| a. | Letter and Word Recognition | 78 | 1.3 |
| b. | Reading Comprehension | 77 | 1.4 |
| c. | Math Concepts & Application | 74 | 1.1 |
| d. | Math Computation | 70 | K.7 |
| e. | Spelling | 78 | 1.3 |
| f. | Listening Comprehension | 88 | K.11 |
| g. | Oral Expression | 60 | <K.0 |

## Special Education Teacher

52. Mrs. B, student's 2007-2008 classroom teacher at Warren, testified. She has been at Warren for 26 years, has a master's degree in special education, and an endorsement in special education, and learning behavior. There are six students in her class, in the 2nd, 3rd and 4th grade. They all have emotional or behavioral disorders as their primary or intermediate disability.

53. She finds student to be a lovable, sweet girl, who has had some behavioral problems. For example, she had to be removed from class when she took a pin and stuck Mrs. B in the leg, and then said something inappropriate to the teacher's aide.

54. She says she believes the student has the ability to retain, and that her issues are mainly behavioral. As of student's 5th week progress report for the current school year, she had a D in reading, and a C in writing.

55. In terms of methodology she is using to educate student, Ms. B testified that she is using all different methods, including things like sentence structure, grammar, spelling, and decoding. They use Harcourt reading curriculum to help in decoding, which comes with some reading activities, and are working on consonant and vowel patterns for phonemic awareness. All the students are working on grammar, sentences, spelling, paragraph writing, and decoding. She testified she has passed her spelling tests, though there is only evidence of one such test in the record.

56. Mrs. B. testified that student uses books on tape a couple times a week, and that there are two computers in class, though one works and the other doesn't. They are using Star Fall, Study Island and other computer programs, though she couldn't say how much time per week the students spent on the computer.

57. Ms. B is familiar with student's BIP and functional behavior analysis. She does daily behavior tallies and a weekly behavior checklist. Ms. B is not trained in the use of restraints.

58. Ms. B testified that they use several activities to implement the written expression goal (Dist. 85), including drawing and writing in journals, and (Dist. 93) phonics, grammar, sight words and vocabulary. She uses some old phonics books and tears the activities out of the book, and doesn't know who the publisher is. Ms B uses an "eclectic approach," taking from several sources to educate student.

59. On student's social/emotional goals, Ms. B testified that they talk and praise student, and they have a prize box that the student can earn from for good behavior. She is often able to redirect student for her behaviors.

## Case Manager on Summer Assessment Team

60. DP, Case Manager and Dean of Students at Ames Middle School, has worked 7 years for CPS, and served on the summer assessment team that evaluated student. He has been a special education teacher, and has Type 3 and Type 10 certificates. He participated as the general education teacher in student's summer assessment, providing input particularly on modifications and accommodations.
61. DP testified that the recommended placement was appropriate for student, because her test scores were within two year range of grade level.  He also testified that before placing student in a private therapeutic day school, services needed to be attempted at a less restrictive setting first.
62. DP has had two days of formal training in Wilson Reading, but has never used a multisensory approach to teaching phonological awareness, nor does he have any experience in teaching decoding skills for students with LD. DP testified that they did not discuss a particular methodology for the writing expression and decoding goal, but that they did discuss providing student with a small classroom setting to provide intensive remediation of her significant reading and math deficits.

## School Nurse

63. CD, the certified school nurse, has been at CPS for 35 years, and holds a Type 75 certificate. She was part of summer assessment team, and completed the School Nursing Assessment. The nurse made recommendations for services, including health/nursing consultative services to monitor her medications in collaboration with school personnel and her physician at a rate of 30 minutes per year. She believes that student's medical conditions can be addressed in the CPS schools.

## School Speech Pathologist

64. AX, a 27 year CPS speech pathologist, has both Type 73 speech/language and Type 75 certificates. He was part of the summer assessment team for student, during which time he completed a report (PD 270) by reviewing case history, old records, consulting with the parent, and reviewing previous speech/language assessments and IEPs.
65. He testified that he evaluated her articulation with his "trained ear" not through a formal assessment, and that he didn't find significant deficits. The test he did administer was the Word-R which looks at language in a variety of contexts. AX testified that his testing took about half an hour, though he "wasn't under time constraints" and "wouldn't compromise the report due to time." To assess pragmatics, he also used informal assessments.
66. Her standard scores were Associations 83: Synonyms 77; Semantics 68; Antonyms 98; Definitions < 55; Multiple Definitions 80; Total 71. Average is 90 to 110.  He concluded she has a mild communication deficit based on five areas: articulation, language, voice quality, fluency and pragmatics.
67. AX drafted the speech/language goals for the student's IEP, which he says was written to encompass both inferential reasoning and expressive reasoning. He believes her behavioral issues overshadowed her educational progress, and that based on her scores in 2005 and 2007 she has stagnated educationally. He wrote a goal for 30 minutes per week of speech in a separate class.

A-15

68. He testified that the speech goal (PD 62) would address receptive language deficits through activities such as a categorization drill. To address pragmatics, good language arts based classes with opportunity for social interaction he thought would be beneficial.

## Lead Speech Pathologist from CPS

69. JC is the lead speech pathologist at CPS, overseeing 125 speech pathologists and paraprofessionals in the district. She holds Type 75 and Type 10 certificates and is a licensed speech pathologist in Illinois. She assists with cases, fills out IEP paperwork and holds a caseload for speech/language services.
70. JC reviewed the educational records and IEEs for student, and talked with her teacher, and the speech pathologist. She also reviewed her IEP and the services, goals and minutes provided. She did not conduct evaluations on the student herself.
71. She first testified that student has a mild expressive learning disorder, but later said that because students' scores were 2 or more standard deviations below normal, she would be considered to have a moderate impairment.
72. When questioned on the matrix at Dist. 352 which is used to determine the severity of a student's disability and the number of minutes they should receive, she testified that the matrix was one of the factors they used, but not the sole factor. She believes 30 minutes per week are sufficient for the student to progress, because they are language based in school, working on language based and vocabulary activities daily. However, she also testified that there was nothing she disagreed with on Marsden-Johnson's report. Marsden Johnson recommends at least 60 mpw of speech/language services.

## The Assistant Principal

73. CA, is the assistant principal at Warren. He holds Type 3 and Type 75 certificates. He was aware student had an IEP developed this summer, but did not review her BIP even though he was involved in the behavioral incident where she stuck her teacher with a pin. (PD 778). He testified that she has been brought to the office a few times for things like profanity or telling the teacher she didn't want to work, but that she is not always formally written up.

## General Education Teacher

74. Ms. W. is the general education teacher at Warren, where she has taught since 1976. She holds a Type 4 early childhood certification. She taught student last year in her second grade class along with 20-22 other students. She had no aides in her class.
75. She testified that student had problems with retention and concentration, and weaknesses in math and reading. She had volatile moods, and could sometimes be redirected, other times she could not. Ms. W said she became aware student was having difficulties about two weeks into the year, and that she turned her name into the office and requested a tutor.
76. The tutor was supposed to be every day, but instead came approximately three times per week. Additionally, a group of nuns came to class to volunteer from time to time.
77. She testified that she recommended student for retention in second grade, and said that she should be tested if they weren't going to put her in the school based problem solving program. Student was failing most subjects, and though they tried "everything, small groups, peer tutors, 1:1, and still she wasn't able to meet her IEP goals."
78. Though Ms. W testified that her critical thinking and fluency improved slightly and she was able to retain more, her grades were: F in reading, written composition, spelling and science. B's in music, library science and speaking. (Dist. 174)

A-16

79. Ms. W testified there was no name to the program she used to educate the students. They used things like Study Island, hands on activities, and Listening Center.

### School Psychologist/Guidance Counselor

80. MJ is a CPS school psychologist and guidance counselor. She was part of the team who asked the principal to retain student in the first grade, believing that because she didn't go to kindergarten she didn't have the foundation to be successful. She did not, however, believe she had a disability.

### Third Grade Teacher

81. ST is the 3rd grade teacher at Warren School. She holds Type 75 and Type 3 certificates. She has known student from first grade, and says though she is not on grade level, with 1:1 assistance, she thinks she can progress. She worked in Ms. W's classroom on individual and group skills three to five times a week.
82. ST is with student for science twice a week. She testified that student is doing "well", but also said that in substance she is behind, and in activities, she is at a lower middle level of achievement. Her 5th week progress report reflects a grade of C. (PD 779).
83. Education Station, a branch of Sylvan, was recommended, but student couldn't participate because of an issue with transportation after school. Instead, she did ATS at home, another computer based program. The school was supposed to provide her with a computer for home use, but it doesn't appear they did.

### School Social Worker

84. JHW has been the school social worker at CPS for 32 years, and has a Type 73 certificate and is a Licensed Social Worker. JHW met briefly with student and her mom as part of the summer assessment team. She reviewed the Hartgrove Hospital report (PD 31-33), the history presented, what brought her to the hospital, and her worsening of aggressive behavior. She found student eligible for social work services, and attended the summer assessment/IEP meeting. (PD 72-84).
85. JHW drafted the social work IEP goals (PD 119 through 121), and though they need to use evidence based materials, she cannot spell out particular materials for the social worker who is providing the services. Goals included identification of school and classroom rules to help her address her behaviors and why they are continuing, (PD 120), as well as a goal for managing emotions.
86. JHW recommended a separate class with individual services for 90 minutes per month, based on the fact that student is receiving outside mental health counseling and her classroom teacher is addressing emotional issues.
87. JHW agreed with the placement in the instructional classroom, and believed that she needed to be given an opportunity to be served in a less restrictive setting before attempting a therapeutic day school.

### Teacher Assistant

88. Ms. D has been a teacher assistant at Warren since 1983, and works in Ms. B's classroom. She says student is bright, but sometimes irritable, and once she threw a book at her.

89. They work on writing in the morning, spend two hours reading, then go to lunch. After lunch is story time, math, science, and social studies. She goes to the regular education class for science. In writing, they are working on journals, and they work on sounding out words in the phonics book.
90. She is not familiar with Orton Gillingham or Lindamood Bell, and testified that Ms. B is the one who decides on lessons, assessments and tests.

### Previous Case Manager at Warren

91. MH was case manager at Warren from 1999 to 2007, and a teacher from 1972 until she retired. She said that student had been skipped over kindergarten and placed in first grade because she was six years old.

### Independent Speech Language Evaluation

92. Janet Marsden Johnson provided an independent speech/language evaluation (PD 315) on 8/29/07. She works in a clinical setting, and teaches at a university. She has been involved in 20-30 IEP meetings for clients per year, and has written IEP goals. She assessed student in her office, finding her cooperative, friendly, outgoing, and able to answer questions in age appropriate manner. Johnson reviewed reports from 2001-2002, which she said showed significant deficits in speech and language which have not disappeared but are manifesting differently.
93. As part of her evaluation, Johnson administered several tests. On the Peabody Picture Vocabulary Test IIIA (PPVT-IIIA), student obtained a raw score of105, standard score 93, and age equivalent of 7.11, placing the student in the low average range. She also administered (PD 316) Expressive One Word Picture Vocabulary Test, where student had a raw score of 77, standard score 92, and age equivalent of 7.5, again scoring in the low average range. On (PD 317) the Test of Auditory Perceptual Skills Revised (TAPS 3), the student scored low average or below average for all subtests on this test, which assesses the ability to discriminate, perceive and process auditory information. On the Expressive Language Test, student scored significantly below average on all subtests. Johnson also administered the Test of Written Language (TOWL) (PD 318). Student scored in the average range for vocabulary and story construction, but her spelling, style and use of written language to combine sentences, determine logic in sentences and use of contextual language were significantly below average. Finally, Johnson administered the Test of Pragmatic Language (TOPL) (PD 319). It was attempted but not finished due to student's anxiety and fatigue.
94. Johnson concluded that student has receptive and expressive language difficulties, and demonstrates difficulty with auditory and language processing. Johnson recommended that student receive 60 minutes per week of individual or group speech per week with consult time allowed in the classroom to facilitate support for academic areas. (PD 320), along with a small, language rich classroom with a small teacher to student ratio. She recommended multisensory input for learning with use of auditory and visual input, along with accommodations for her auditory processing deficits and speech language difficulties.

A-18

**Independent Psychological Evaluation**

95. Dr. Martin Blackman conducted a psychological evaluation of student in February, 2007. (PD 322; Dist. 42), who was referred to evaluate her behavioral and academic difficulties. For this evaluation, several tests were administered including the Wechsler Intelligence Scale for Children Fourth Edition, (WISC-IV); Wide Range Achievement Test Third Revision (WRAT-III), Wechsler Individual Achievement Test II Listening Comprehension subtest (WIAT-II); ADHD Ratings Scale IV De Paul version; Wide Range Assessment of Memory and Learning II Verbal learning subtest; Developmental Test of Visual Motor Integration Fifth Edition; Sentence Completion Test; Thematic Apperception Test; Children's Depressive Inventory; Projective Drawing Tasks; Parent Interview; Patient Interview; Review of Available Records. On the WISC IV she received a full scale score of 79. On measures of verbal comprehension, her ability to demonstrate basic social common sense as well as abstract thinking fell within average range on the comprehension subtest. Defining vocabulary words was within the borderline range, leading the evaluator to conclude that she may have difficulty expressing herself verbally.

96. On Perceptual Reasoning, her ability to work with her hands and copy blocks was average. Nonverbal abstract thinking was low average and noting visual patterns was borderline. Working memory was average with more difficulty organizing letter number sequences. Processing speed was variable. She was scored average on the coding subtest, but impaired on the symbol search subtest.

97. The Wide Range Achievement Test-Third Edition was administered. Her one word reading score of 77 was at 1st grade level, as was her spelling score of 84 and her math score of 68. The Developmental Test of Visual Motor Integration Fifth Edition was administered, and her score of 75 was at the borderline level.

98. The Wechsler Individual Achievement Test II Listening Comprehension subtest was administered. Her score of 103 was at the 3.2 grade level. The Wide Range Assessment of Memory and Learning II Verbal Learning Subtest presented student with thirteen words over four trials. She got frustrated and could not focus, scoring in the borderline range.

99. According to Blackman, Student wants to do well and is frustrated by her difficulties. She is easily irritated, gets frustrated, doesn't have friends and feels alone. She noted she does many things wrong which is impacting her self esteem. She would like to "be good." She pushes others away, takes things personally and is hard on herself. She feels vulnerable and anxious. She can be impulsive and not think things through. She has little control over her emotions and becomes overwhelmed and angry

100.        The summary of Blackman's report indicates student's IQ scores fell within borderline to low average. Her full scale IQ score was borderline, and her verbal comprehension IQ was lower than in 2005, particularly in the area of vocabulary. Her processing speed was much lower due to poor performance on a measure of visual scanning. The evaluator noted student has deficits in reading, spelling and math, but her listening comprehension is a strength.  Her intense emotions and sadness reflect a mood disorder and her inattention and hyperactivity lead to ADHD diagnosis. His diagnostic impressions were: Axis I 296.90 Mood Disorder- NOS; 315.9 Learning Disorder, NOS; 314.9 ADHD, NOS. Axis II V71.06 No Diagnosis. Axis III Apparent Birth Trauma, History of Asthma, School Related Difficulties, Emotional Dyscontrol. Axis IV CGAS Current 51.

101.        Blackman's recommendations were for therapy to address her sadness and frustration, ensuring she understands what has been said when she is presented with information, because she may not always be paying attention; stress reduction and

relaxation exercises; and anger management through individual or family treatment. He recommended monitoring for OT issues, and recommended a Case Study because of demonstrated difficulties in academics, and clinical needs in behavior management.

### Dr. Cherie Laaperi's Review

102.    Cherie Laaperi, PhD, a psychosocial educational evaluator for 15 years, was hired to conduct a records review. She is a specialist in dyslexia, has been trained in Orton-Gillingham, has drafted IEP goals, and has done 50 to 75 evaluations per year. She has taught fifteen years in a clinical model for special education, and has participated in about 40 IEP meetings per year. More than half the students she sees are not diagnosed with a learning disability.

103.    Laaperi made recommendations based on her document review both in written form and in testimony at hearing. (PD 780). "In reviewing CPS documentation through the end of second grade, it is clear from IEPs and from psychological evaluations that student has needed significant remediation at each grade level to learn. This is the profile of a student who has not overcome the debilitating effects of a combination of deficits in oral, language, auditory and visual processing, and lack of phonological awareness and phonics instruction.

104.    She believes student's learning disability is of longstanding duration and she disagreed with the previous diagnosis that found student didn't have a learning disability. (PD 250-252). Student is dyslexic, she has a language based learning disability that significantly negatively affects her progress in listening, speaking, reading, written language and math. Her lack of academic success has impinged on her social and emotional development. Because she cannot read, write or count she is unable to function in a classroom with other third grade students.

105.    Laaperi reviewed student's IEPs, and like the other evaluators, she found significant deficits in reading and math. She recommended intensive remediation, consisting of 40 to 60 minutes per day of 1:1 phonological awareness and phonics for one year.

106.    Laaperi testified that student needs a daily, structured, systematic program, preferably one of the Orton Gillingham multisensory approaches to learning phonics for reading and spelling. (PD 782). She didn't think it was made clear in student's IEP that she needed such a system, or how the district would achieve the goals it set out for student, such as how they would teach student to read words that have predictable patterns. Laaperi testified that Spire, Intensive Phonics, Wilson Phonics, COVE phonics, and SLANT are all equally effective methods, and that using visual, auditory, and tactile/kinesthetic channels will reinforce student's learning and improve retention. She also suggests using manipulatives such as letter tiles from Scrabble or magnetic letters to teach student how to build words from individual sounds as well as how to break them apart.

107.    Laaperi also recommended fluency training to work on her reading comprehension, as well as repetition in reading and oral reading. For her self esteem issues, Laaperi recommends both group and individual social work services, and for her auditory processing issues an audiological evaluation for central auditory processing issues.

108.    Laaperi's recommendation for placement is a small class with a teacher trained in multisensory methods of reading and writing. If this isn't available in CPS, she recommends that student be placed out of district in a small supportive multisensory classroom with individual attention like that offered at a school such as Cove School and Acacia Academy.

### Independent Occupational Therapy Records Review

109.    Mary Block testified via telephone. She is an occupational therapist in school and private practice who has participated in IEP meetings at schools. She was hired to do a records review and did not interview student, parent or anyone from the school.

110.    She testified that rather than just evaluate student's handwriting like the school did (PD 257), she would evaluate student's organizational skills, look at her locker, her desk, and her keyboarding on the computer. She suggested a task analysis to determine what the student could and couldn't do and have the student copy, work on paper and work with manipulatives.

### Metropolitan Family Services

111.    Laurel Greenwood, MSW, is a Metropolitan Family Services mental health therapist who does individual and family counseling and case management. She received student's case in March, 2007, and sees her once a week or once every other week in relation to her diagnoses with ADHD, LD and oppositional defiant disorder. In PD 378, Greenwood wrote to the school because she thought student needed special education services in April of 2007. The student's behaviors were deteriorating, including mood swings, lying, a fire setting incident in the summer, and sticking her teacher with a pin. She testified that student needs to learn coping and anger management skills, and she may need hospitalization.

### Katherine Fouks, Acacia Academy

112.    Katherine Fouks, the Acacia Academy Principal and Clinical Director, was present to testify. She has a master's degree in education, specialization in reading. She holds Type 3, Type 10, K-12, and Type 75 certificates.

113.    She testified that Acacia, a private therapeutic day school, has as its mission to "maximize the potential of each child that enters." She said they are personalized, with an emphasis on academics, building self confidence and personal worth. They are approved and certified by the Illinois State Board of Education. In terms of student body makeup, 75% of Acacia students have a primary disability of L.D. Acacia is also approved to accept students with EBD, speech/language, TBI and autism among other disabilities.

114.    Fouks herself hasn't met student, but student and her mother visited the school and met the staff. Based on her review, student needs an intensive, hands on, multimedia program. She believes student could be successful at Acacia, in a class with six students, with a teacher, an aide and two 1:1 aides.

### 2007 School Work/Behavior

115.    There are several samples of student's work admitted into evidence. These include: (PD 480-483) reading comprehension exercises, 2/8 correct; (PD 484-486), another reading comprehension exercise, 4/8 correct; (PD 487-489), an exercise where student had to pick the word that corresponded to the picture, 12/15 correct; (PD 498), a math exercise, 4/15 correct; (PD 499) and (PD 506), math exercises, 5/6 and 7/9 correct, respectively; (PD 504) a reading/writing exercise, 1/5 correct. On another similar exercise (PD 505), 1/6 correct. On her sight words progress chart (PD 512) student

increased from 2/19 to 18/19 in one month. On (Dist. 266), a spelling/word test given 9/10/07, student got 100% correct out of 14 words.

116.    On test scores from October 3, 2007 (Dist. 244), student scored as follows: Word recognition 1.6; Math calculations 2.0; Spelling/language 1.5.

117.    She continues to have behavioral issues, spitting on the floor, (Dist. 252), and sticking her teacher with a pin (Dist. 253), and telling another student she was going to kick her ass after school. Student was disciplined and received a one day suspension (Dist. 255).

118.    The school occupational therapist, AG, was not present to testify. Both parties agreed to stipulate to the facts in her report.

### Conclusions of Law:

### Statute of Limitations

In her due process complaint, student alleges failure to provide a free appropriate public education from July, 2002 through the present time. District raised an objection to the time frame due to the statute of limitations issue. A reading of the applicable regulation is instructive. 34 CFR 300.507 (a)(2) reads: "The due process complaint must allege a violation that occurred not more than two years before the date the parent or public agency knew or should have known about the alleged action that forms the basis of the due process complaint ***"

Student's due process complaint was filed on June 20, 2007. Her amended due process complaint was filed August 6, 2007. Therefore, the applicable time frame is from June 20, 2005 to the present and issues raised which occurred outside the statutorily prescribed timeline cannot be considered here. Evidence submitted from outside that timeframe can be considered; however, it will not form the basis of the decision in this matter.

### Free Appropriate Public Education

Determining whether a student has received a FAPE begins with the two-prong analysis set out in *Bd. of Educ. of Hendrick Hudson Central Sch. Dist. v. Rowley,* 458 U.S. 176 (1982) *("Rowley")*. First, the district must comply with IDEA's statutory procedures; second, it must develop an IEP reasonably calculated to enable the student to benefit from the special education and related services.

Once the school district has met these two requirements, the courts cannot require more; the purpose of the IDEA is to 'open the door of public education' to [disabled] children, not to educate a [disabled] child to her highest potential. Board of Ed. Of Murphysboro Community Unit School Dist. No. 186 v. Illinois State Board of Educ. 41 F.3d 1162,1166. (7th Cir. 1994).

### Compliance with Procedural Requirements

One of the two prongs of Rowley requires that LEAs comply with statutory procedural requirements. These include, among other things, written notice and participation requirements. According to 23 Il.Adm.Code 226.520, "The written notice a school district is required to provide to a parent prior to a proposal or refusal to initiate or change the identification, evaluation, or educational placement of, or the provision of FAPE to, a child shall conform to the requirements of 34 CFR 300.503. That notice must be provided whenever the public agency (1) Proposes to

initiate or change the identification, evaluation, or educational placement of the child or the provision of FAPE to the child; or (2) Refuses to initiate or change the identification, evaluation, or educational placement of the child or the provision of FAPE to the child.  (Authority: 20 U.S.C. 1415(b)(3) and (4), 1415(c)(1), 1414(b)(1))

According to 23 Il.Adm.Code 226.530, with respect to parents' participation in meetings, school districts shall conform to the requirements of 34 CFR 300.322 and 300.501. For purposes of 34 CFR 300.322(a)(1), "notifying parents of the meeting early enough to ensure that they will have an opportunity to attend" shall mean notification no later than ten days prior to the proposed date of the meeting. In addition, the district shall take whatever action is necessary to facilitate the parent's understanding of and participation in the proceedings at a meeting, including arranging for and covering the expense of an interpreter for parents who are deaf or whose native language is other than English. (Source: Amended at 31 Ill. Reg. 9915, effective June 28, 2007)

It is clear that adequate parental notice, involvement and participation in planning the student's IEP is necessary to fulfill procedural requirements. *Alexis v. Bd. of Educ. For Baltimore Cnty. Pub. Sch.,* 40 IDELR 7 (Md. 2003). It is undisputed that minor procedural flaws or technical violations do not automatically require a finding that a district has denied the student a FAPE. *Heather S. v. State of Wise,* 125 F.3d 1045,46 (7th. Cir.1997).

However, there are times when violations will be determined to be more substantial and rise to the level of a denial of FAPE. In  *Knable v. Bexley City School District* 238 F.3rd 755 (6th Cir. 2001), the parents sought reimbursement for placing their child in private school after they withdrew him from Bexley Public Schools.

Knable was first enrolled in a private school, began exhibiting behavioral problems in first grade and began receiving private therapy. He was moved into the public schools, and at age 10 he was diagnosed with ADHD, oppositional defiant disorder and dysthymia, and was admitted to an inpatient facility for his aggressive behaviors. He was found eligible for special education and an out of district placement was recommended. Student was hospitalized, received day treatment with no IEP, and then returned to public school with a BIP. He continued to exhibit behavioral problems, and failed three classes. The Knables found an out of state placement for him and sent him there. Months later, a draft IEP was created, but no meeting convened. After their son was in the private placement for two years, they filed for due process seeking reimbursement.

In this case, the court found that the procedural violations the district engaged in, i.e., not convening an IEP meeting for nearly a year after the student was found eligible for special education services, resulting in the parents sending student out of state, caused substantive harm, seriously infringing on the parents' opportunity to participate in the IEP process and resulted in the loss of educational opportunity for the student. *Id.*

Similarly, despite a history of disability and early childhood services, as well as documented behavioral difficulties, it took two years of failing grades, increasingly violent and aggressive behaviors, and the filing of a due process complaint for the district to take notice of this young girl and find her eligible for special education services. This can clearly be considered a procedural violation of the type contemplated under IDEA. Similarly, a failure to properly evaluate a student can result in a denial of FAPE.

A-23

### Failure to Evaluate

Under IDEA a district must assess a student in all areas of suspected disability using a variety of assessment tools and strategies to gather functional developmental and academic information to determine if the student has a disability. 20 USC 1414(b)(2)(A); 20 USC 1414(b)(3)(B).

A district must ensure that it recognizes a student's needs and completes a full and individualized evaluation. *Kevin T. v. Elmhurst Comm. Sch. Dist. No. 205*, 36 IDELR 153 (N.D. Il. 2002). The failure to fully evaluate a student leads to inadequate programming. *Bd. of Educ. of Oak Park and River Forest High Sch. Dist. No. 200 v. Kelly E.*, 21 F.Supp. 2d 862, 875 (N.D.Ill. 1998).

In *Kelly E.*, the court held that the failure of the school district to respond to the MDC recommendation that psychological testing be conducted to better assess Kelly's possible learning disability was not a de minimis procedural violation" but a denial of FAPE.

In the present case, student has been evaluated on several different occasions beginning at a very young age. However, the evaluations conducted failed to reveal the true nature and extent of this young girl's disabilities, and in fact led district personnel to conclude that the child had no disabilities at all despite consistently failing grades and behavioral difficulties. Furthermore, despite requests from her mother, and recommendations from both teachers and treating professionals that she be evaluated due to the nature of her academic and behavioral difficulties, she was not evaluated for eligibility for special education services until the due process request was filed in June of this year. This is precisely the denial of FAPE contemplated by the *Kelly E.* and *Knable* courts.

Though it is clear that procedural violations resulted in a denial of a free appropriate public education, it is still necessary to examine the IEP that was developed to determine if it was reasonably calculated to confer an educational benefit.

### An IEP Reasonably Calculated to Confer Educational Benefit

The second prong of Rowley provides that the IEP developed for a child with disabilities must be "reasonably calculated to confer educational benefit." *Bd. of Educ. of Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S. 176 (1982). The IEP should include the following information: (1) a statement of the child's present levels of educational performance, including how the child's disability affects the child's involvement and progress in the general curriculum; (2) annual goals and short term objectives for improvements; (3) a description of the specifically designed instruction and services that will enable the child to meet those objectives; (4) a statement of how the child's progress toward the annual goals will be measured." *Kevin T. v. Elmhurst Comm. Sch. Dist. No. 205*, 36 IDELR 153 (N.D. Il. 2002).

An IEP must contain specific goals, and the goals and objectives must provide measurable criteria against which the student's achievement can be measured. *Independent Sch. Dist. No. 701, Hibbing Pub. Sch. v. J.T.*, 45 IDELR 92 (Minn. 2006). Additionally, the student must receive more than a nominal benefit from specialized instruction and related services. *T.H. v. Bd. of Educ. of Palatine Comm. Consol. Sch. Dist.*, 55 F. Supp. 830 (N.D. Ill. 1999). Rowley does not mean that a de minimis benefit is sufficient. M.*C. v. Cent. Regional Sch. Dist.*, 81 F.3d 389,393 (3rd Cir. 1996).

In accordance with *Rowley*, the regulations governing IDEA require that IEPs should be based on the child's unique needs and not on the child's disability. 34 CFR 300.300(a)(3)(ii). A student's intellectual potential must be considered in determining whether the student benefited from his educational program. *Kevin T. v. Elmhurst Comm. Sch. Dist. No. 205*, 2002 WL 433061 (N.D. Ill. 2002).

In *Kevin T*, the court said that to determine if Kevin's IEPs were reasonably calculated to confer sufficient educational benefits, it must assess Kevin's intellectual potential, given his disability and then determine the academic progress Kevin made under the IEPs designed and implemented by the district.. Though Kevin possessed average intellectual potential, his scores decreased on IQ and academic achievement from 1990 to 1999. Despite knowing of the decrease, the district did not review or revise his IEPs to address the academic difficulties.

Similarly, in *Nein*, 95 F.Supp 2d at 972, the student's IQ score dropped twenty points in three years but the district didn't make any changes to the IEP to address the change. The court held "that where a child with a severe learning disability but significant potential makes no transferable progress in three years and where there was no indication the public school was ready and able to change direction, the limit of due weight and judicial deference to school authorities have been exceeded." Id at 975.

In *Board of Education of Oak Park & River Forest High School District No. 200*, 21 F. Supp. 2d at 877, the court found the student's poor academic record indicated that the educational benefit she was receiving was minimal. Student had failed half her classes and except for passing several pass/fail classes and making one B she received Ds in the remaining half. The court agreed that the district failed to institute a "systematic and comprehensive plan to deal with the student's reading difficulties" and that "such a failure was manifested by the absence of any goals or objectives that specifically addressed these reading deficits." *Id.*

Similarly, in the present case, student has received little, if any benefit from her education. From first grade on, the majority of her grades have been Fs. Even since she has been determined eligible for special education, as of her fifth week progress report she was getting a C and a D. While this is progress compared to all Fs, this cannot be what the Rowley court had in mind when they said the IEP should be reasonably calculated to confer an educational benefit.

The next question then, is whether the proposed placement is the least restrictive environment for student.

### Least Restrictive Environment

The least restrictive environment ("LRE") provision provides that "To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." *Beth B. v. Mark Van Clay*, 282 F.3d 493, 496 (7th Cir. 2002). *see also Kerry M. v. Manhattan School District #114*, 2006 WL 2862118 (N.D. Ill. 2006); *Bd. of Educ. of LaGrange Sch. Dist. v. Ill. State Bd. of Educ.*, 184 F.3d 912, 915-16 (7th Cir. 1999)); *Bd. Of Educ. Of Chicago v. Ill. State Bd. Of Educ.46 IDELR 219 (ND IL 2006).*

The LRE is the one that allows the disabled child to be educated with her nondisabled peers, known as mainstreaming, to the greatest extent appropriate. *Beth B. v. Mark Van Clay 282 F.3rd 493, 496 (7th Cir. 2002).; Casey K. v. St. Anne Comm. High School District 302, 46 IDELR 102 (DC Central Dist. IL 2006).*

The LRE requirement shows Congress' strong preference in favor of mainstreaming, but does not require, or even suggest, doing so when the regular classroom setting provides an unsatisfactory education. *Beth B.* 282 F.3d at 497. A disabled child may be removed from the regular classroom when the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily. *Id.* The IDEA requires mainstreaming to the maximum extent appropriate, not the maximum extent possible. *Id.*

While the district argues that the LRE for student in this case is the cross-categorical instructional program at Warren School, the evidence does not support them. The teachers are clearly dedicated, interested, and well meaning. However, not one of the teachers who interacts with student on a daily basis is trained in the multisensory educational methods that are needed for this young woman to make educational progress. This is not a question of preferred methodology so as to run afoul of *Lachman v. East Maine Sch. Dist. 63, 852 F.2d 290 (7th Cir. 1988).* (when a proposed IEP is based upon accepted, proven methodology, a parent doesn't have the right to compel a district to provide a different methodology that the parent considers more appropriate.) The problem here is not that parent prefers one methodology over another; it is that the school is using no methodology at all. While the "eclectic" approach mentioned by student's teacher is admirable and might work well on a student with less significant challenges, it is clearly inappropriate and ineffective for this young woman. As a result, the proposed placement is not the least restrictive environment for student.

### Remedies

One of the remedies requested by student, and which a hearing officer is empowered to provide is compensatory education. "Compensatory education" is a "legal term used to describe future educational services" which courts award to a disabled student under the IDEA "for the school district's failure to provide a FAPE in the past." *See Kevin T.*, infra.

When an IEP fails to confer some (i.e. more than de minimis) educational benefit to a student, that student has been deprived of the appropriate education guaranteed by IDEA. It seems clear, therefore, that the right to compensatory education should accrue from the point that the school district knows or should know of the IEPs failure. *M.C. and G.C. v. Central Regional School District*, 81 F.3rd 389, 397 (3rd Cir. 1996). This student should have been found eligible for special education as early as June 20, 2005; her right to compensatory education accrues from that date.

### It is Ordered That:

1. CPS provide student with private therapeutic day school placement at public expense at

Acacia or a similar school;

2. CPS provide for independent educational evaluations at public expense, including but not limited to psychological assessments of cognitive and academic skills, occupational therapy assessments, and assistive technology assessment, as well as reassessing the nature and extent of student's learning disabilities.

3. CPS shall reimburse the cost of the independent speech language evaluation parent obtained.

4. CPS shall provide compensatory education services for loss of FAPE during the past two years, including:

   a. Additional social work and/or psychological counseling services of 30 mpw for two years;

   b. Tutoring by a certified special education teacher at a site selected by the parents for two hours per week for two years;

5. CPS shall convene an IEP meeting and draft an IEP that will consider the full nature and extent of student's disabilities to provide a program of education and related services that will provide her with a free and appropriate public education, incorporating (1) through (4) above.

### Right to Request Clarification:

Either party may request clarification of this decision by submitting a written request for such clarification to the undersigned hearing officer within five (5) days of receipt of this decision. The request for clarification shall specify the portions of the decision for which clarification is sought, and a copy of the request shall be mailed to the other party(s) and the Illinois State Board of Education. After a decision is issued, the hearing officer may not make substantive changes to the decision. The right to request such clarification does not permit a party to request reconsideration of the decision itself, and the hearing officer is not authorized to entertain a request for reconsideration.

### Right to File Civil Action

This decision is binding on the parties unless a civil action is timely commenced. Any party to this hearing aggrieved by this final decision has the right to commence a civil action with respect to the issues presented in the hearing. Pursuant to ILCS 5/14-8.02a(i), that civil action shall be brought in any court of competent jurisdiction within 120 days after a copy of this decision is mailed to the parties.

The undersigned Hearing Officer certifies that she served copies of the aforesaid Decision and Order upon Parents and District, through counsel, and the Illinois State Board of Education at their

stated addresses by depositing same with the United States Postal Service at Chicago, IL via certified mail, with postage prepaid before 6:00 p.m. on November 9, 2007.


Dated this 16th day of November, 2007.

LINDA MASTANDREA
HEARING OFFICER